IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84329-0-I |
| Respondent, | DIVISION ONE |
| v. | ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |
| EBRIMA JOBE, | |
| Appellant. | |

Appellant Ebrima Jobe filed a motion for reconsideration of the opinion filed on December 4, 2024 in the above case. A majority of the panel has determined that the motion for reconsideration should be denied. The panel has also determined that it should withdraw the opinion and file a substitute opinion. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied, the opinion filed on December 4, 2024 is withdrawn, and a substitute opinion shall be filed.

FOR THE COURT:

_____
Chung, J.

_____
Coburn, J.

_____
Mann, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Respondent,<br><br>          v.<br><br>EBRIMA JOBE,<br><br>                   Appellant. | No. 84329-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Ebrima O. Jobe was convicted of rape in the second degree. Jobe challenges his conviction on several grounds. He claims the trial court erred in concluding that records of the victim's communications with a University of Washington (UW) victim advocate were protected from disclosure based on a statutory privilege for sexual assault advocates and that UW did not have to produce records relating to a different allegation of sexual assault made by K.A. against a student. He also challenges as misconduct statements made by the prosecutor during closing and another statement referring to DNA evidence. He also challenges the court's admission of his statements to a detective, a community custody condition in his sentence requiring him to submit to urinalysis and breath analysis, and the imposition of a victim penalty assessment (VPA) and a DNA collection fee.

We affirm Jobe's conviction. However, we hold that the urinalysis condition is unconstitutional because it is not narrowly tailored to Jobe's crime of

conviction and remand to the trial court for revision. We accept the State's concessions and remand to the trial court to strike the breath analysis condition, the VPA, and the DNA fee from the sentence.

FACTS

In July 2022, Ebrima O. Jobe was convicted by a jury of one count of rape in the second degree in violation of RCW 9A.44.050(1)(a). Jobe's conviction arose from events that occurred on the morning of June 29, 2019.

Jobe, an Uber driver, accepted a pick-up request from K.A. for a ride from the Capitol Hill neighborhood of Seattle, Washington to her home in the University District. After initially entering Jobe's car and sitting in the back seat, K.A. testified that she moved up to the front seat to charge her cell phone. According to K.A., she and Jobe initially engaged in "small talk," which escalated to Jobe asking "more personal questions . . . like where you from . . . do you have a boyfriend; what kind of men do you like." Jobe disregarded K.A.'s requests to be dropped off at a stop sign across from her house and insisted he would drop her off in the alleyway behind her house. According to K.A., upon driving into the alleyway Jobe began complimenting her and attempted to "put [her] hand down his pants." When the car came to a stop, K.A. unbuckled her seatbelt and was going to pick her phone up from the floor, where it had fallen, when Jobe got out of his seat and tried to get on top of her. K.A. stated that she told Jobe to get off of her but that he told her they could "have fun" and pinned her arms down and sat on top of her so her legs were in between his and

2

immobilized. Jobe then put the seat back, held K.A.'s arms down, pulled her shirt up and pulled her bra down.

K.A. testified that Jobe began touching and kissing her breasts and tried to take off her pants, which prompted her to try to push him off of her. Jobe then removed her underwear and digitally penetrated her vagina for a couple of minutes. According to K.A., Jobe exposed his penis and began touching her stomach and outside of her vagina with it, at which point she began screaming for him to get off and that she did not want to participate. K.A. testified that Jobe did not penetrate her vagina with his penis, but did so with his fingers. K.A. stated that Jobe then "stopped . . . resisting me trying to push him off and finally got off of me," at which point she pulled up her pants, collected her belongings and ran to her house. Crying and sobbing, K.A. entered her house, ran upstairs and woke up her roommate, and said, "I was attacked by my Uber driver; can you call the police?" The roommate then called the police on K.A.'s behalf.

Contrary to K.A.'s version of events, Jobe testified to a consensual encounter. According to Jobe, K.A. was talking to two men before she entered his Uber, so he asked if she was in a relationship with any of them and she responded that she was not. Jobe testified that he had asked her what type of men she likes and that she explained her preferences. Jobe stated that he commonly talks with passengers "to make everybody happy," and that in this instance, K.A. seemed to engage in his conversation. They continued conversing until he reached the destination, at which point K.A. gave Jobe her phone number. Jobe complimented K.A. as she began to exit the vehicle, which

3

prompted her to close the door and remain in the Uber. Jobe testified that K.A. directed him to drive into the alleyway and that she began to rub his thigh, he attempted to deflect it, but she persisted. Jobe said they then began kissing, he rubbed and kissed her breasts, and K.A. began to rub his penis from inside his pants. Jobe testified that at no point did he remove his pants or touch K.A.'s vagina. Further, Jobe stated that K.A. asked him if he had any condoms, to which he replied that he did not. Jobe explained that he stopped because he did not want to have sex without a condom. After stopping their encounter, K.A. collected her belongings and exited his vehicle. Jobe testified that K.A. was "an active participant" throughout the entire encounter.

Later that day, Jobe's wife woke him up because two officers were at their house and wanted to talk with him. Jobe spoke with the two officers but did not tell them that he kissed K.A. or did anything with her while in the alley. Jobe admitted at trial that he initially lied to officers and did not tell them about his physical contact with K.A. because he felt ashamed for engaging in such conduct outside of his marriage.

During discovery, Jobe attempted to subpoena the records of a University of Washington (UW) victim advocate, Victoria Adams, on the basis that K.A. had discussed the alleged rape with Adams. Initially, the trial court ordered UW to produce the records. However, UW filed a motion to reconsider the trial court's order, arguing that the records are confidential and that Jobe had not met his burden of making a "particularized showing" that identified the information he sought. Subsequently, the trial court granted UW's motion to reconsider and

4

denied Jobe's request for a subpoena to compel Adams's records for an in camera review.

Jobe also attempted to subpoena the records related to another allegation of sexual assault (UW incident) made in 2018 by K.A., seeking to demonstrate "either or both [K.A.'s] credibility and propensity to make false allegations, or a possible explanation for her to have responded inappropriately and otherwise-inexplicably to an innocent interaction with Mr. Jobe." The UW incident occurred between K.A. and another UW student. The trial court reviewed the records relating to the UW incident in camera and determined that there was no discoverable material therein and, accordingly, sealed the records.

The jury convicted Jobe of rape in the second degree. The trial court sentenced Jobe to a standard range sentence of 78 months of incarceration and 36 months of community custody. The trial court also imposed a $500 VPA and a $100 DNA collection fee. Additionally, the trial court imposed conditions including a prohibition on the possession or consumption of controlled substances along with a condition permitting random urinalysis and breath analysis.

Jobe timely appeals.

ANALYSIS

Jobe challenges the following on appeal: (1) the trial court's decision refusing to review a sexual assault advocate's records in camera; (2) the trial court's decision after in camera review refusing to disclose records relating to a separate sexual assault allegation made by K.A.; (3) the prosecutor's statement during closing argument that injuries like K.A.'s do not arise from consensual

sexual contact; (4) the trial court's decision to impose breath analysis and urinalysis testing conditions; and (5) the trial court's imposition of the VPA and a DNA collection fee. In a statement of additional grounds (SAG), he also claims the prosecutor's reference to DNA evidence was misconduct and challenges the court's admission of his statements to law enforcement.

I. <u>Sexual Assault Advocate Records</u>

Jobe argues that the trial court erred by refusing to review Adams's records in camera because the RCW 5.60.060(7) privilege for sexual assault advocates does not apply to Adams. He further argues that even if Adams's records are privileged, he made a "plausible showing" that the records contain evidence that is material and favorable to his defense.

A. <u>RCW 5.60.060(7) Sexual Assault Advocate Privilege</u>

RCW 5.60.060 defines who may be subject to examination for communications between two privileged parties. Specifically, a "sexual assault advocate may not, without the consent of the victim, be examined as to any communication made between the victim and the sexual assault advocate." RCW 5.60.060(7). A sexual assault advocate is defined as any

> [e]mployee or volunteer from a community sexual assault program or underserved populations provider, victim assistance unit, program, or association, that provides information, medical or legal advocacy, counseling, or support to victims of sexual assault, who is designated by the victim to accompany the victim to the hospital or other health care facility and to proceedings concerning the alleged assault, including police and prosecution interviews and court proceedings.

RCW 5.60.060(7)(a).[1]

The proper interpretation of a statute is a matter of law reviewed de novo. State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). The purpose of statutory interpretation is to determine legislative intent in a manner as to give effect to that intent. Columbia Riverkeeper v. Port of Vancouver USA, 188 Wn.2d 80, 91, 392 P.3d 1025 (2017). A reviewing court ceases its inquiry if the plain language of the statute has only one interpretation. In re Adoption of T.A.W., 186 Wn.2d 828, 840, 383 P.3d 492 (2016). This analysis may consider the statutory scheme. State ex rel. Citizens Against Tolls (CAT) v. Murphy, 151 Wn.2d 226, 245-46, 88 P.3d 375 (2004). Plain meaning is understood within "the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.' " In re the of Dependency of Z.J.G., 196 Wn.2d 152, 163, 471 P.3d 853 (2020) (quoting Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014)). Jobe makes two arguments as to why the court should reject the State's contention that Adams's records are subject to the RCW

---

[1] The State cites to RCW 28B.112.030, which defines the scope of confidentiality that applies to communications between a campus-affiliated advocate and the victim. This chapter provides that communications between the victim and the campus-affiliated advocate are confidential and "are not subject to public inspection . . . unless (a) [t]he survivor consents to inspection or copying; or . . . (d) [a] court of competent jurisdiction mandates that the record be available for inspection or copying." RCW 28B.112.030(1), (2). However, this statute addresses public disclosure of such records and is distinct from the privilege statute at issue.

5.60.060(7) privilege.[2] First, Jobe argues that Adams's affiliation with the UW Police Department (UWPD) means that she is not a "sexual assault advocate" within the meaning of RCW 5.60.060(7). Second, Jobe argues that Adams is not a "sexual assault advocate" covered by the privilege because the primary function of her role within UW Student Life is inconsistent with a sexual assault advocate. We disagree on both grounds.

1. Adams's Association with UWPD

Jobe argues that Adams cannot be a sexual assault advocate within the meaning of RCW 5.60.060(7) because she is physically housed in the UWPD office and uses a UWPD e-mail. He claims that the trial court's initial hesitation about Adams's relation to a law enforcement agency is an indicator that her work is outside the scope of the RCW 5.60.060(7) privilege. Jobe emphasizes the relevant statutory language referencing "*community*"-based programs and asserts this conflicts with Adams's affiliation with a law enforcement agency, a governmental entity.

---

[2] In briefing, Jobe argued that any concern that in camera review would stymie a person's ability to meet with a sexual assault advocate was "misplaced." But at oral argument, Jobe claimed more specifically that the trial court abused its discretion by applying the wrong standard to determine whether to review Adams's records in camera because it weighed the "chilling effect" that in camera review would have on a victim's access to assistance. We do not consider claims raised for the first time during oral argument "where there is no argument presented on the issue and no citation to authority provided." State v. Olson, 126 Wn.2d 315, 319-20, 893 P.2d 629 (1995). But in any case, here, the record shows that the trial court applied the correct standard to evaluate whether Jobe established materiality. In its order denying in camera review of Adams's records the trial court stated "[t]his case presents a clash of two competing interests—the rights of a defendant to an effective defense and the rights of a sexual assault victim to confidentiality and privacy." However, it then went on to explain it believed the sexual assault advocate privilege applied and that Jobe had the burden of showing materiality for "records [that] are likely to have information that is exculpatory. . . . [but] [t]he Defendant fails in this burden. . . . [because] the Defendant has speculation or suspicion as to what the records could contain, but falls short of showing the records contain impeachment materials or exculpatory evidence."

The State responds that nothing in RCW 5.60.060(7) explicitly bars "units" that are housed within police agencies from using the protection of this privilege. As the State notes, this provision is different from the statutory language in RCW 5.60.060(8)(a) defining a "domestic violence advocate," which expressly excludes anyone who is employed by or directly supervised by a law enforcement agency. When specific language is used in one instance but not another, "[a] difference in legislative intent is evidenced. We assume the legislature means exactly what it says." In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 842, 215 P.3d 166 (2009). And the State asserts that because the legislature did not explicitly incorporate the language excluding employment or supervision by law enforcement agencies in RCW 5.60.060(7), this exclusion does not apply to that provision.

We agree with the State. Here, even if Adams's e-mail and physical office are within UWPD, the evidence shows that Adams is independent from the UWPD and her records are not accessible to law enforcement. Also, her work relevant to this case focused on "trauma-informed support," which is within the statutory definition of "sexual assault advocate" as she provided "information, medical or legal advocacy, counseling, or support to victims of sexual assault." RCW 5.60.060(7)(a). Jobe's argument that she is not a sexual assault advocate within the meaning of the statute is unavailing.

2. Role of Sexual Assault Advocate

Jobe next argues that even absent Adams's affiliation with UWPD, the State failed to show that Adams is affiliated with a qualifying program, for which

9

RCW 5.60.060(7) privilege could attach. Jobe points to the fact that Adams's job is classified under "UW Student Life," which is not a "community sexual assault program," or a "victim assistance unit, program, or association," but rather an educational institution that provides various services to students. Jobe seems to suggest that because Adams is not "part of a specific division, unit, program, or association designated specifically to provide sexual assault advocacy services," she is not a qualified sexual assault advocate.

The State argues that this is an incorrect reading of the statute because nothing in the statutory language requires sexual assault advocacy "to be a unit or program's exclusive function." Nor does the statutory language mandate the sexual assault advocate to be part of a larger defined "program" or "unit," an interpretation the State characterizes as "overliteral" and contrary to the legislature's intent. The State contends that "community sexual assault program[s]" are designed to provide "community-based social services" which would logically include "sexual assault advocacy." Therefore, a sexual assault advocate working under the auspices of a community-based sexual assault program that is part of a larger social service agency is included in the protection of RCW 5.60.060(7), Again, we agree with the State. The statutory language of RCW 5.60.060(7) defines "sexual assault advocate" broadly and includes "the employee or volunteer from a community sexual assault program or underserved populations provider, victim assistance unit, program, or association, that provides information, medical or legal advocacy, counseling, or support to victims of sexual assault" or is designated by the victim to accompany them to receive

health care or to proceedings concerning the alleged assault. Consequently, the list of persons and entities in the first part of the definition is limited only by the functions of the entity; in other words, the entity must "provide[] information, medical or legal advocacy, counseling, or support" or be designated to accompany the victim to certain appointments. Neither the language nor the purpose of the statute support interpreting it to require that the advocate be working with a program that provides only services to sexual assault survivors.

We conclude that under a plain language reading of RCW 5.60.060(7), Adams was providing the type of service defined by the statute and, therefore, even if the program of "UW Student Life" also provided other services, Adams would qualify for the protection of the statutory privilege therein. Therefore, the sexual assault privilege applies to Adams's records.

B. Materiality

Jobe argues that even assuming Adams's records were privileged and subject to protection under RCW 5.60.060(7), the trial court should have conducted an in camera review to determine whether the records nevertheless should be disclosed. We review a trial court's decision about whether to conduct an in camera review of privileged records for an abuse of discretion. State v. Gregory, 158 Wn.2d 759, 791, 147 P.3d 1201 (2006), as corrected (Dec. 22, 2006), overruled by State v. W.R., Jr., 181 Wn.2d 757, 336 P.3d 1134 (2014). A trial court abuses its discretion when "no reasonable person would adopt [its] view." State v. Olmedo, 112 Wn. App. 525, 530, 49 P.3d 960 (2002).

11

Although protections for certain types of sensitive information carry great weight, they are not so great as to prevent disclosure in all circumstances. Pennsylvania v. Ritchie, 480 U.S. 39, 58, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). Courts use in camera review to appropriately balance the State's interest in confidentiality and the defendant's right to exculpatory evidence. Id. at 61. Due process requires an in camera review of otherwise privileged or confidential records when the defendant adequately demonstrates that the records contain material evidence. Gregory, 158 Wn.2d at 791. This is a threshold matter that requires the defense to make a " 'plausible showing' that the information will be both material and favorable to the defense." Id. (citing Ritchie, 480 U.S. at 58 n.15).[3] Material evidence is that which has a reasonable probability of impacting the outcome of the case. Id. A "reasonable probability is probability sufficient to undermine confidence in the outcome." Id.

Further, in camera review is justified when the defendant provides a nonspeculative basis for seeking the records. State v. Cleppe, 96 Wn.2d 373, 382, 635 P.2d 435 (1981). This requires the trial court to make its determination while acknowledging "the difficulty of explaining in a vacuum why the testimony is crucial." Id. Any doubt regarding the records should be resolved in favor of conducting an in camera review. Id. However, a claim asserting that privileged files may "lead to other evidence or may contain information critical to the

---

[3] The court in Gregory explained that "particularized showing" and "plausible showing" were not conflicting standards; rather, both required "some showing of materiality." 158 Wn.2d at 792 n.11 (citing State v. Diemel, 81 Wn. App. 464, 468, 914 P.2d 779, rev. denied, 130 Wn.2d 1008, 928 P.2d 413 (1996)).

defense is not sufficient to compel a court to make an in camera inspection."
State v. Diemel, 81 Wn. App. 464, 469, 914 P.2d 779 (1996).

Jobe contends that he met his burden of making a nonspeculative and "plausible showing" that Adams's records pertaining to her discussions with K.A. were material. In his discovery motion, Jobe cited to the investigating police officer's statement suggesting that Adams was in contact with the officers. Specifically, Jobe asserts that the officer's note that "Adams. . . . advised that [K.A.] was having some difficulty in determining how far in the prosecution she wanted to participate," indicated K.A.'s "confidence and credibility in making the allegations of rape, and is a nonspeculative basis to conclude that the records may contain exculpatory evidence."

Jobe relies on Gregory as an example of a case where the court determined that in camera review was necessary despite privilege where the credibility of the witness-victim was likely to impact the outcome of the trial. In Gregory, the defendant sought to show that the alleged victim was working as a prostitute at the time of the incident and had consented, and thus sought to admit the alleged victim's Department of Health and Human Services (DSHS) dependency files "to determine whether the files contained any evidence of recent (and therefore relevant) evidence of prostitution." 158 Wn.2d at 779-80. There, the Gregory court held that the trial court should have reviewed the dependency records in camera because it was reasonable to believe that DSHS would have documented any activity related to prostitution in its files, and that this could have led to other evidence that the alleged victim engaged in

13

prostitution near the time of the incident with the defendant. Id. at 795. Jobe argues that like in Gregory, the absolute contents of Adams's records is unknown, but K.A.'s uncertainty about participating in his prosecution could be attributable to her "lack of confidence in Mr. Jobe's culpability." As a result, Jobe contends that he sufficiently showed materiality because K.A. had a reason that made her hesitant to help prosecute him, which was "likely to be explicitly stated in her communications with Adams."

The State distinguishes Gregory, as DSHS maintains case-specific records in which information pertaining to the witness-victim's recent prostitution would have been documented, whereas here, Adams does not maintain case-specific records and there is no evidence to suggest that she discusses specific details of assaults by e-mail with victims. The State compares this case to Diemel, in which the alleged victim began meeting with a therapist following the alleged rape and the defendant sought disclosure of the therapist's records through an in camera review claiming that the victim may have discussed certain topics with her therapist. 81 Wn. App. at 466. There, the court held that the defendant's request for in camera review was too speculative, explaining that "[t]he fact that she might have discussed the circumstance of her 'consent' with the therapist is not sufficient [alone] to justify the intrusion of inspection." Id. at 469.

We conclude that Jobe's argument that K.A. may have been hesitant to participate in his prosecution is speculative and does not show the materiality of Adams's records. Unlike the defendant in Gregory, 158 Wn.2d at 795, 798, Jobe

14

has not demonstrated a likelihood that Adams possesses any case-specific notes implicating consent or details of the incident that are material to Jobe's defense. As the State notes, K.A.'s indecision could be attributable to an alleged victim's feelings of trauma, shame, embarrassment, and fear of retaliation. As in Diemel, 81 Wn. App. at 469, the possibility that K.A. may have discussed consent with Adams is too speculative. Further, K.A. testified at trial and defense was able to cross-examine her, so Jobe had the opportunity to ask about her hesitancy and attack her credibility.

Therefore, because Jobe has failed to demonstrate that Adams's records contain evidence material to his defense, we affirm the trial court's decision not to conduct an in camera review.

## II. Records of Other Sexual Assault Allegation by K.A.

The trial court conducted an in camera review and determined that the UW incident records did not include discoverable or material information and sealed the records to uphold K.A.'s privacy interests. Jobe asks that we review the sealed records to determine whether the trial court abused its discretion in refusing to disclose the records. Jobe further argues that if we determine that the trial court abused its discretion in limiting disclosure, we should reverse his conviction because the error was not harmless beyond a reasonable doubt. The State acknowledges that Jobe is entitled to appellate review of the sealed records, but contends that if we determine that nondisclosure was an error, any error was harmless.

On appeal, an appellate court reviews sealed transcripts to determine whether the court abused its discretion in refusing to disclose records that were subject to in camera review. State v. Casal, 103 Wn.2d 812, 822-23, 699 P.2d 1234 (1985). The State's duty to disclose exculpatory information is ongoing, even if the information was previously "deemed immaterial." Ritchie, 480 U.S. at 60.[4]

Jobe's reason for seeking the records for the UW incident was that they were likely material and necessary to show "either or both [K.A.'s] credibility and propensity to make false allegations, or a possible explanation for her to have responded inappropriately and otherwise-inexplicably to an innocent interaction with Mr. Jobe." But after reviewing the sealed records pertaining to the UW's investigation and adjudication of a prior sexual assault allegation made by K.A., we conclude there is no information that is discoverable or material. We hold that the trial court did not abuse its discretion by declining to disclose the sealed records.

III.    Prosecutorial Misconduct

Jobe challenges as misconduct the prosecutor's closing statement that "[c]onsensual sexual contact does not result in bruising on the lips, bruising on the shoulder, bruising on the arm [or] in injuries to the vagina and the perineum." He argues the statement was improper and prejudicial because the prosecutor

---

[4] If we determine that evidence should have been disclosed, then we must evaluate whether any error was harmless. Gregory, 158 Wn.2d at 795. However, an erroneous refusal to conduct in camera review may be sustained if the reviewing court determines that " 'nondisclosure was harmless beyond a reasonable doubt.' " Id. at 797-98 (quoting Ritchie, 480 U.S. at 58). When analyzing if nondisclosure was harmless beyond a reasonable doubt it is necessary to determine whether the defense knew of the information or with reasonable diligence could have discovered it. Id. at 798.

did not present evidence to support this proposition, but rather appealed to the "passions and prejudices" of the jury. The State posits that the statements were neither improper nor prejudicial. We agree with the State.

On appeal, we review alleged prosecutorial misconduct under an abuse of discretion standard. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). A court will reverse if the defendant can demonstrate that the prosecutor's conduct was improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). A reviewing court must consider the impact of the prosecutor's alleged improper conduct in the full context of the trial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). A review of the totality of the trial includes evidence entered in " 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). A prosecutor who refers to evidence not included in the record and who "appeals to passion and prejudice" has acted improperly. Fisher, 165 Wn.2d at 747.

Prosecutors "ha[ve] wide latitude to argue reasonable inferences from evidence, including evidence respecting the credibility of witnesses." State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). However, prosecutors are limited to making arguments based on evidence admitted in the record. State v. Slater, 197 Wn.2d 660, 681, 486 P.3d 873 (2021); see also State v. Kovalenko, 30 Wn. App. 2d 729, 749, 546 P.3d 514 (2024) (confirming that prosecutors must not make arguments that are not sustained by the record). A prosecutor must

also be mindful to avoid using the power of their position to influence the jury because "of the possibility that the jury will give special weight to the prosecutor's argument." In re the Pers. Restraint of Glasmann, 175 Wn.2d 696, 706, 286 P.3d 673 (2012) (quoting AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8 (2d ed. 1980)). However, a prosecutor may comment on a witness's veracity as long as a personal opinion is not expressed and as long as the comments are not intended to incite the passion of the jury. State v. Rodriguez-Perez, 1 Wn. App. 2d 448, 460, 406 P.3d 658 (2017).

Here, during closing argument, the prosecutor discussed the physical evidence, first, pointing to the evidence of amylase, a protein commonly found in saliva, that was present along with Jobe's DNA in K.A.'s right breast swab and her perineal vulvar swab. The prosecutor then said, "That physical evidence not only proves sexual contact, but it proves that [K.A.] and her testimony was credible and that Mr. Jobe's was not." He continued discussing other physical evidence in the form of injuries documented by a nurse on a "traumagram,"[5] including bruising on the lips, shoulder, and arm; a layer of skin removed from the vulva; and two scratches or abrasions near the perineum. The prosecutor then made the following statement:

> Those injuries testified to by Nurse Bearbow and documented on the traumagram is physical evidence that proves Mr. Jobe used force. He didn't just touch her, but he was using force. Consensual sexual contact does not result in bruising on the lips, bruising on the shoulder, bruising on the arm. Consensual sexual contact does not result in injuries to the vagina and the perineum.

---

[5] The prosecutor further described a traumagram as "a diagram of a person's body where she is writing down the injuries that she sees, how big they are, and what they look like."

Jobe's counsel immediately objected to the prosecutor's remarks as being outside the scope of the evidence, not a reasonable inference, and not accurate. The trial court overruled the objection, stating, "For the jury to determine."[6]

Jobe states that he "has no quarrel with the prosecution pointing to K.A.'s injuries to argue that the injuries corroborate her claim that the encounter was nonconsensual."[7] But he maintains that the prosecutor's statement was improper because it was not a "reasonable inference to draw from the injuries" and was an inaccurate characterization because such injuries could arise from consensual sexual activities carried out "in a cramped space."

As Jobe points out and the State concedes, no expert or other witness provided explicit testimony that consensual sexual contact would not result in bruising to the mouth, arms, vulva, or perineum.[8] The State nevertheless asserts that given that the jury had to assess "two incompatible narratives," "[t]he prosecutor's broader point was that K.A.'s injuries made her version of events more credible."

---

[6] Therefore, the heightened standard required to establish prosecutorial misconduct when the defendant has not objected at trial does not apply. See Lindsay, 180 Wn.2d at 430 (explaining that defendants who fail to object to or request a curative instruction at the time of the misconduct waive the issue absent the conduct being "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice").

[7] Thus, Jobe does not argue explicitly that the State improperly vouched for K.A.'s credibility. "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." State v. Coleman, 155 Wn. App. 951, 957, 231 P.3d 212 (2010).

[8] Jobe analogizes to State v. Levy-Aldrete, No. 52733-2-II, slip op. at 13 (Wash. Ct. App. March 30, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2052733-2-II%20Unpublished%20Order.pdf. He argues that as in Levy-Aldrete, the prosecution made a "blanket assertion . . . [that] was not supported by any evidence adduced at trial and is not a reasonable or accurate inference to draw without any such evidence on this subject." We do not discuss unpublished cases unless necessary for a reasoned decision, GR 14.1(c), which is not the case here.

Here, the context shows that prior to the contested statements, the prosecutor reviewed the physical evidence, including the right breast swab and the perineal vulvar swab, which both showed the presence of amylase and Jobe's DNA. He argued that this evidence "not only proves sexual contact, but it proves that [K.A.] and her testimony was credible," and that Jobe's was not. The prosecutor continued by reviewing other physical evidence of injuries documented by the nurse who examined K.A., and then made the statements at issue, asserting that K.A.'s injuries were evidence of the use of force. After Jobe objected, and the court ruled it was "[f]or the jury to determine," the prosecutor repeated, "Consensual sexual contact does not result in injuries to the vagina or injuries to the perineum." He then continued, "That evidence is proof of a struggle. Proof that Mr. Jobe used force . . . . It's also proof that . . . [K.A.'s] testimony was credible and that Mr. Jobe's was not." The prosecutor then discussed "[t]he third piece of physical evidence," K.A.'s underpants, which did not have DNA but did have blood. He urged the jury, "you can conclude from that evidence the blood is a result of the injuries to her genitals caused by Mr. Jobe."

Even if the prosecutor did not similarly preface the statement at issue with words such as "you can conclude from that evidence," the context was a discussion of the physical evidence and the inferences to be drawn therefrom. Immediately preceding the statement, the prosecutor gave a detailed recounting of the injuries documented by the nurse, so the statement suggested that from the injuries, the jury could infer lack of consent. Immediately after the statement at issue, the prosecutor stated, "[t]hat evidence is proof of a struggle," that Jobe

used force, and that K.A. was credible. And after discussing the three categories of physical evidence—the DNA, the documented injuries, and blood on K.A.'s underpants—the State concluded, "The physical evidence proves the elements of this crime."

Even if the argument was improper, we could not conclude that the statement was so prejudicial as to warrant a new trial. Once improper conduct is shown, a defendant must still demonstrate the conduct was prejudicial. Monday, 171 Wn.2d at 675. A prosecutor's conduct is prejudicial when " 'there is a substantial likelihood the misconduct affected the jury's verdict.' " Id. at 675 (quoting State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007)).

Jobe argues that because consent was the primary question at trial, the prosecution's assertion that consensual sexual contact does not cause the types of injuries K.A. sustained was particularly prejudicial to his primary defense. He also argues that other than K.A.'s testimony, there was a lack of evidence suggesting the encounter was nonconsensual; therefore, the prosecutor's statements were substantially likely to influence the jury.

In the present case, the allegedly prejudicial statements were brief and all occurred in one portion of the prosecutor's initial closing argument. Further, the statements were not repeated in the State's rebuttal argument. Jobe was able to respond in his closing argument about the appropriate inferences from the physical evidence, including regarding whether the contact was consensual. For example, he characterized K.A.'s injuries as being barely noticeable and "very

minor." He also argued the bruising and other injuries could have had some other origin.

The jury also heard evidence from several sources supporting the State's argument regarding consent. As previously discussed, the prosecutor highlighted the physical evidence, including the presence of a YSTR profile, a type of DNA testing focusing on the Y chromosome that is present only in biological males, which although not definitive, "represented a strong likelihood that Jobe had touched K.A.'s genitals, something he repeatedly claimed had not occurred." Further, in addition to K.A.'s trial testimony, the State noted that her version of events was corroborated by her actions and demeanor. Immediately upon leaving Jobe's car, K.A. ran "screaming and crying into her roommate's bedroom" and asked her to call 911. Her statements to her roommate, her father, and the officers soon after the events were also consistent with her trial testimony that a nonconsensual sexual assault occurred.

This evidence conflicted with Jobe's version of events. On direct examination, Jobe testified that at no point did he remove his pants or touch K.A.'s vagina, and again on cross-examination, Jobe testified that he only engaged in "normal kissing" as well as touching and kissing of K.A.'s breasts, but that he did not touch her vagina or take his penis out of his pants. But Jobe's credibility was impeached by, for example, the fact that he initially denied to police that he had sexual contact with K.A., but after learning that there was DNA evidence, he changed his story.

The State also emphasized in its closing that in addition to the physical evidence, the jury heard witness testimony, and the jury instructions stated that the jury was the sole judge of both the credibility of each witness and the weight to be given to each witness's testimony. The court also gave the standard instructions to the jurors that they "are the sole judges of the credibility of each witness," "the lawyers' statements are not evidence," and to "disregard any remark, statement, or argument that is not supported by the evidence." The jury is presumed to follow the court's instructions. State v Stenson, 132 Wn.2d 668, 729-30, 940 P.2d 1239 (1997).

Therefore, even if the prosecutor's statements were improper, there was not a substantial likelihood that they affected the jury's verdict. There was strong physical evidence and other evidence corroborating K.A.'s version of events. By contrast, there was evidence challenging Jobe's credibility. We conclude the prosecutor's statements that consensual sexual conduct does not result in the type of injuries present in this case were not improper and not prejudicial and thus not reversible prosecutorial misconduct.

IV.    Urinalysis and Breathanalysis Community Custody Condition

Jobe challenges the community custody condition in his sentence that requires that he "[b]e available for and submit to urinalysis and/or breath analysis upon request of the CCO and/or chemical dependency treatment provider." He argues that the condition is unconstitutional because it has nothing to do with his crime of conviction.

We review the imposition of community custody conditions for an abuse of discretion and will reverse the conditions when they are manifestly unreasonable. State v. Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018). RCW 9.94A.703 defines the types of community conditions that a trial court is required to impose, those that are imposed unless waived, and those that the court can discretionarily impose. A court is also permitted to impose "any crime-related prohibitions." RCW 9.94A.703(3)(f). However, a reviewing court must more carefully review a community custody condition that impedes a fundamental constitutional right. State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

The sentencing court imposed a standard condition requiring that Jobe "[n]ot possess or consume controlled substances except pursuant to lawfully issued prescriptions." However, the court did not impose any prohibition on consuming alcohol. The State concedes that without such a prohibition, there is no need for breath analysis testing, as such testing is intended to monitor compliance with prohibitions on alcohol. Thus, the State agrees that the breath analysis should be stricken from the record. We accept the State's concession.

Regarding urinalysis testing, Jobe argues that when alcohol and drugs do not contribute to the underlying offense a trial court is barred from enforcing the prohibitions on consumption and possession conditions through random urinalysis testing. Jobe cites State v. Olsen, a case involving the crime of driving under the influence (DUI), in which our state Supreme Court held that random urinalysis testing can be a constitutionally permissible way of monitoring DUI probationers because the testing is "a narrowly tailored monitoring tool imposed

pursuant to a valid prohibition on drug and alcohol use." 189 Wn.2d 118, 134, 399 P.3d 1141 (2017). However, the Olsen court also noted that random urinalysis testing may not be warranted if there is not an adequate connection to a validly imposed probation condition. Id.

Indeed, as Jobe notes, this court has distinguished Olsen and concluded that when a defendant's conviction is not for a drug- or DUI-related offense and there is no evidence of a connection between the offenses and drugs, random urinalysis infringes on a probationer's privacy interests because the condition is not "narrowly tailored []or reasonably necessary" to achieve a compelling state interest. State v. Greer, No. 78291-6-I, slip op. at 21-22 (Wash. Ct. App. Nov. 18, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/782916.pdf; State v. Stark, No. 76676-7-I, slip op. at 13 (Wash. Ct. App. Oct. 15, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/766767.pdf.[9]

The State argues that random urinalysis testing is constitutional because it "merely monitors compliance with another properly imposed condition," citing State v. Vant, 145 Wn. App. 592, 603-04, 186 P.3d 1149 (2008). In Vant, the court held that because the prohibition on use or possession of controlled substances was authorized by statute, and the random urinalysis condition was imposed to ensure compliance with the prohibition, the condition was within the court's discretion to impose. Id. at 604. The State also relies on State v. Stone, in which Division Two of this court held that "the trial court did not exceed its

---

[9] Division Two has reached the same conclusion as did Division One in Greer and Stark. See State v. Rosales, No. 57463-2-II, slip op. at 5 (Wash. Ct. App. Mar. 12, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057463-2-II%20Unpublished%20Opinion.pdf. We may cite to unpublished decisions when necessary for a reasoned decision. GR 14.1(c).

authority when it ordered [the defendant] to 'submit to urinalysis. . . testing. . . to verify compliance,' because the condition regarding illegal drugs [was] valid." No. 52233-1-II, slip op. at 10 (Wash. Ct. App. Feb. 19, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2052233-1-II%20Unpublished%20Opinion.pdf.

But Vant's reasoning was based on the court's discretion under RCW 9.94A.700(4)(c) to impose a prohibition on controlled substances. The issue here is not the court's statutory authority, but whether the condition is constitutional. Imposing an unconstitutional condition is an abuse of discretion. State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). In the cases on which the State relies, Vant and Stone, the defendants did not raise the same constitutional challenge as Jobe does here. 145 Wn. App. at 603; No. 52233-1-II, slip op. at 6-7.

The State also cites State v. Preble, No. 38625-2-III, slip op. at 12 (Wash. Ct. App. Mar. 9, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/386252_unp.pdf, to note that no Washington court has determined whether urinalysis testing is permissible for a case involving a sex offense, but does not explain why, if there is no evidence that drugs or alcohol contributed to the crime, urinalysis testing is narrowly tailored to enforce a condition in a sentence for rape in the second degree.

We conclude that on the present facts, the urinalysis condition is not narrowly tailored to Jobe's crime and therefore infringes on his privacy interests.

We remand to the trial court to strike both the breath analysis condition, based on the State's concession, and the urinalysis condition from Jobe's sentence.

## V.     VPA and DNA Collection Fee

Jobe argues that we should strike the VPA and DNA collection fee because he is indigent and recent amendments to the relevant statutes bar courts from imposing such fees on indigent defendants. See RCW 7.68.035(4) (prohibiting courts from imposing the VPA when the defendant is indigent); LAWS OF 2023, ch. 449, § 1 (eliminating DNA collection fee). Amendments to statutes governing legal financial obligations apply retroactively to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023). The State does not dispute that Jobe is indigent and concedes that the VPA and DNA collection fee should be stricken. We remand to strike the VPA and DNA collection fee from Jobe's judgment and sentence.

## VI.     Prosecutorial Statement Regarding DNA Evidence

In his SAG, Jobe claims the prosecutor engaged in misconduct by "misstat[ing] DNA evidence." While cross-examining Jobe, the prosecutor stated, "And your DNA was found on her perineal vulvar swab." Jobe immediately objected on the basis that this misstated the evidence, because there was no testimony that it was his DNA, but rather, only that the swab had "YSTR DNA that could have been of anyone of his patrilineal line."[10] The court responded, "All right, rephrase the question." The prosecutor then asked, "There's no reason why your DNA should be found on her perineal vulvar swab, right?" Jobe answered,

---

[10] Jobe initially notes that this statement was made in closing, but the record indicates that it was made on the prosecutor's cross-examination of him.

"He really doesn't know, but he doesn't think so."

On appeal, Jobe again challenges the prosecutor's first statement about the DNA as misconduct on the same grounds. Because Jobe objected below, we review the claim for abuse of discretion. Lindsay, 180 Wn.2d at 430. We will reverse if the defendant can demonstrate that the prosecutor's conduct was improper and prejudicial. Monday, 171 Wn.2d at 675.

Here, we conclude that the prosecutor's statement that Jobe's DNA was found on the perineal vulvar swab was not improper. The Washington State Patrol forensic scientist testified that "[t]he major component that I determined from the perineal swab matched that of Mr. Jobe." She explained that the way the YSTR testing works, "no one in his paternal lineage could be excluded," because such a person—for example, a brother with the same father—would be expected to have the same YSTR profile. She further explained that the statistical analysis of the sample revealed that "this partial major profile . . . [would not] occur more frequently than one in 9,700 male individuals in the U.S. population." There was no evidence that anyone else in Jobe's paternal lineage would have come in contact with K.A.'s vulva or perineum. Thus, the prosecutor's statement that Jobe's DNA was "found on the swab" referred to the forensic expert's testimony that the "major component" from the perineal vulvar swab "matched" Jobe's DNA.

The prosecutor's statement about DNA evidence was not improper, but even if it were, it was not prejudicial. The statement was a question to Jobe, not an answer by a witness. And the prosecutor, as directed by the trial court,

28

immediately rephrased the question.

  VII.  Waiver of *Miranda* Rights

  In his SAG, Jobe additionally challenges the trial court's decision to admit his statements to law enforcement as a violation of his Fifth and Fourteenth Amendment rights. In particular, he contends that his <u>Miranda</u> rights were violated because as a non-native English speaker, he did not fully understand the charges against him and did not knowingly, voluntarily and intelligently waive his <u>Miranda</u> rights.

  The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Any person subjected to a custodial interrogation must be advised of the right to remain silent pursuant to the federal and state constitutions. <u>Miranda</u>, 384 U.S. at 479. A detained person must unambiguously invoke their right to remain silent for these protections to flow. <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

  Importantly, a detained person can waive the privilege of self-incrimination when such waiver is voluntary, knowing, and intelligent. <u>Miranda</u>, 384 U.S. at 444. The prosecution has the burden of showing by a preponderance of the evidence that a waiver of <u>Miranda</u> rights was knowing, voluntarily and intelligent. <u>State v. Athan</u>, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). A valid waiver can be express or can be implied when the record reflects that the defendant understood their rights and "volunteered information after reaching such understanding." <u>State v. Terrovona</u>, 105 Wn.2d 632, 646, 716 P.2d 295 (1986). The waiver need

29

not be explicit, but rather, may be inferred from the facts and circumstances. State v. Wheeler, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987). We will not disturb a trial court's conclusion that a waiver was voluntary if it was deemed voluntary by a preponderance of the evidence and there is substantial evidence in the record to support this. Athan, 160 Wn.2d at 380. Substantial evidence is evidence that sufficiently "persuade[s] a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

In this case, after a CrR 3.5 hearing, the trial court entered written findings of fact and conclusions of law, including that Jobe was arrested in his home and was read his Miranda rights before being transported to the police station. Further, the court found that the investigating officer, Detective Calvin Hinson, took custody of Jobe and brought him into an interrogation room. Hinson read Jobe his Miranda rights from a pre-written card. The court found that while reading the rights, "Hinson spoke in a different and quicker tone."

In his SAG, Jobe highlights several factual findings:

- Finding 9: "Detective Hinson asked Mr. Jobe if he understood the rights and he responded 'kind of' but not '100%.' "
- Finding 11: "Mr. Jobe indicated that his English was 'okay' and he also spoke Mandinka and Wolof."
- Finding 13: "Mr. Jobe responded appropriately to all questions asked of him and Detective Hinson had ample opportunity to assess his understanding of the English language."
- Finding 15: "Mr. Jobe demonstrated he has a high level of intelligence and has an advanced ability to speak and understand English."

However, despite highlighting these findings, Jobe does not challenge these or any of the findings. Unchallenged findings from a CrR 3.5 hearing are verities on appeal. State v. Escalante, 195 Wn.2d 526, 531, 461 P.3d 1183 (2020) (where

defendant moved to suppress his statements but did not challenge the trial court's findings rendering them verities). Rather, he challenges the court's conclusions that he was fully informed of his Miranda rights and "made a knowing, intelligent, and voluntary waiver" and that his "statements were given freely and voluntarily."

Jobe suggests the court should have considered his language and cultural views, given that "Jobe was not from the United States, had never been arrested and interrogated, and previously had lived in a country where it was illegal for the police to lie." Further, Jobe points to the fact that he had two interpreters at trial. However, a language barrier may not prevent a valid waiver of Miranda warnings, so long as the detained person, " 'understands that he does not need to speak to police and that any statement he makes may be used against him.' " State v. Teran, 71 Wn. App. 668, 672-73, 862 P.2d 137 (1993) (quoting United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir.1990), cert. denied, 499 U.S. 908, 111 S. Ct. 1111, 113 L. Ed. 2d 220 (1991)).

Here, in unchallenged findings, the court noted that Hinson and Jobe had a "lengthy conversation" in English about Jobe's life and that Jobe had worked as an Uber driver in London before moving to Seattle. After Hinson read him his rights, despite Jobe's initial hesitation about his understanding, he declined Hinson's offer to re-read the Miranda warnings and stated that his English was "okay." When the conversation turned from Jobe's life to the investigation, he "continued to freely answer the questions posed to him." Then, when Hinson asked Jobe for a DNA sample, Jobe said "he didn't want to provide a sample

because he didn't want to incriminate himself." The court found that Jobe referred back to his <u>Miranda</u> rights read at the beginning of the conversation and asked if he could have a lawyer, at which point Hinson ceased questioning. Jobe demonstrated his understanding and comprehension of the <u>Miranda</u> rights by explicitly invoking them.

These facts support the conclusion that a language barrier did not prevent Jobe from understanding his <u>Miranda</u> warnings and his rights. The court's findings support its conclusion that Jobe made a knowing, voluntary and intelligent waiver. The court did not err by admitting Jobe's statements to Hinson.

CONCLUSION

We affirm the conviction, but remand to strike the urinalysis and breath analysis conditions as well as the VPA and DNA collection fee from the sentence.

_____
Chung, J.

WE CONCUR:

_____        _____
Coburn, J.                      Mann, J.

32